**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALBERTO FRANCISCO ORTEGA-LARA,<br><br>               Petitioner,<br><br>    v.<br><br>S. HATTON,<br><br>               Respondent. | No.  2:18-CV-2737-JAM-DMC-P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, and Respondent's answer, ECF No. 8.  Petitioner has not filed a traverse.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

### *The Burglary*

Because defendants concede they were appropriately convicted of committing a burglary on the night of October 30, 2010, we dispense with a detailed recitation of the evidence establishing their commission of this crime. The following summary will suffice to place the murder in context.

Lara was living in his grandmother's house with his girlfriend, Veronica Calvetti. The house had two driveways; the main driveway on the right of the house had a built-in carport covering the back of the driveway and a separate stand-alone carport covering the front of the driveway. A blue minivan was parked under the rear carport, next to the front door. A large white truck was park under the front carport, closer to the street.

The night of the burglary, Lara was hanging out in the main driveway beneath the carports (carport area) with fellow gang members Lucero, Flores, and Espinoza. The four were drinking beer and smoking marijuana. Eventually, the party moved to the backyard, where they discussed breaking into a house one street away, behind the house that was immediately across the street. The plan was for Lucero to knock on the front door to make sure no one was home. Then, Flores and Espinoza (14 years old at the time) would act as lookouts while Lara (19 years old) and Lucero (32 years old) broke into the house. Calvetti, who was present for the conversation, decided to join in the endeavor as a lookout, freeing Flores up to enter the house with Lara and Lucero. (footnote 4 omitted).

The burglary happened shortly before midnight. As planned, after it was determined no one was home, Lara, Lucero, and Flores entered the target house's backyard by breaking through a fence and then entered the house itself through a bathroom window. Once inside, they unlocked the back door and began carrying property back to Lara's house, depositing the stolen goods in Lara's backyard. Four trips to the house netted the burglars four flat screen televisions, two laptop computers, a portable DVD player with a monitor, a digital camera, a 35mm camera, two car rims, a Mossberg shotgun, and a non-operational .38-caliber handgun.

///

///

---

[1]       Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012).  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

During a second or third entry into the house, a friend or cousin of Lucero, who went by the nickname Diablo, pulled up in a blue van and parked across the street from Lara's house. When Diablo arrived, he handed Lucero a handgun and joined in at least one trip inside the target house, carrying out one of the flat screen televisions. After the burglary was complete, Lucero gave the handgun back to Diablo. Diablo then joined the original burglars in Lara's backyard, where they discussed dividing up the loot. Lara and Espinoza were each to keep one of the televisions, Lucero was to keep the shotgun, and Flores was to keep the .38 caliber handgun. Lara and Diablo then got into a heated argument because Diablo wanted to take one of the televisions, while Lara objected that he "didn't really do anything" to deserve any of the stolen items. Ultimately, Diablo settled for a couple of smaller items and left Lara's house.

The four original burglars returned to the carport area while Calvetti went inside the house and retired to Lara's bedroom. Sometime later, Lara and Lucero carried the remaining stolen items, with the exception of the car rims, to Lara's bedroom. They then returned to the carport area to continue drinking and smoking marijuana.

### The Murder

Lucero was murdered at about 5:30 a.m. He was shot multiple times in the carport area, pushed to the ground and kicked, dragged by two men to the sidewalk in front of a neighboring house, and then shot several more times by the passenger of a car that pulled up next to him as he lay bleeding on the sidewalk. Multiple witnesses saw or heard portions of these events as they unfolded. Because defendants challenge the sufficiency of the evidence to support their culpability for the murder, we summarize these witness accounts in detail.

Calvetti testified she was in Lara's bedroom when she heard an argument coming from the carport area. As far as she knew, defendants and Lucero were the only people at the house, aside from herself and various family members who were inside. During the argument, Lara yelled: "Nigga, give me the gun" or "Nigga, give me back the gun." Someone also yelled: "You don't want this, Nigga." Calvetti did not specify whether or not Lara made the latter statement. Calvetti also heard Flores say: "Calm down." According to Calvetti, she did not recognize two voices involved in the argument. Seconds later, Calvetti heard four gunshots. She went to a window at the front of the house that had a partially obstructed view of the carport area, and saw Lucero being pushed to the ground and kicked. While she initially testified defendants were involved in this altercation, she then clarified she saw only shadows. However, after reviewing her preliminary hearing testimony, Calvetti testified the person who kicked Lucero was wearing a white shirt and each of the defendants was wearing a white shirt while hanging out after the burglary. (footnote 5 omitted). She also testified she did not see anyone other than the defendants in the carport area while Lucero was being pushed and kicked. But again, she admittedly saw only shadows and a white shirt at this point in time. As Lucero lay on the ground in the carport, Calvetti heard him ask Lara to call the police, using Lara's first name: "Albert call the cops." While Calvetti initially denied Lara came inside the house at this time, during the prosecution's redirect examination, after being reminded of her preliminary hearing testimony, she testified Lara did briefly come inside

3

the house before returning outside and he had blood on his sweatpants when he did so.

A short time later, Calvetti heard additional gunshots that did not come from the carport area. Calvetti testified she was also at the front window when she heard these shots. She then noticed a four-door white car, "an old Lincoln or something,"parked in front of Lara's house. Flores and Espinoza got into this car before it drove away toward the west. (footnote 6 omitted).

According to Calvetti, Lara again came inside the house after the second round of gunshots, but before Flores and Espinoza departed in the white car. He was "crying," "hysterical," "pacing back and forth," and "walking in and out" of the house. After three or four of these trips outside, Lara went into the kitchen, where he wiped off his hands with a towel, took off his shirt and sweatpants, ran some water over them in the kitchen sink, and threw them in a basket in the laundry area near the kitchen. While Lara was doing this, Calvetti noticed he had a small cut on his knee. Lara then changed his clothes. Calvetti also testified Lara used her cell phone to call 911, but hung up before the call connected. Her testimony was unclear as to whether this happened before or after he changed his clothes. At some point after Lara aborted his call to 911, Calvetti made the call herself.

We also note Calvetti testified she saw Lara holding what she believed to be a .45-caliber handgun after the burglary, although she admitted to knowing very little about guns. She further testified she did not see any dark cars parked in front of Lara's house the morning Lucero was killed. These cars will become important later.

After the first round of gunfire and physical altercation in the carport area, Lucero was dragged to the sidewalk in front of an adult care home next door. Remedios Garcia witnessed the dragging from the kitchen window of another adult care home across the street. Garcia, who worked at that care home, testified she awoke to the sound of gunfire, ran to the kitchen window, and "saw two men dragging another man." The men doing the dragging were wearing white polo shirts and baseball hats. After depositing Lucero in front of the adjacent care home, they ran away toward the west. Garcia described them as Mexican and estimated their ages to be "around 25," adding during cross-examination she would not have confused them for young teenagers. She initially testified she knew Lara from across the street and he was not one of the men dragging Lucero. However, during the prosecution's redirect examination, Garcia admitted she did not see their faces well enough to know whether or not Lara was one of them. After seeing these men run away, Garcia noticed a "long white car" parked in front of Lara's house. A man wearing a black jacket and dark beanie was standing in the street next to this car. Garcia did not get a good look at his face either. While Garcia did not see this man get into the car, he was no longer in the street when the car drove in the same direction as the two men who ran away. Garcia then left the window to tell her sister, who was in another room, what had happened. As she did so, she heard additional gunfire and returned to the window, where she saw the same white car heading in the opposite direction. (footnote 7 omitted).

4

William Stokes, who lived at the care home where Garcia worked, was outside smoking a cigarette when Lucero was murdered. Stokes suffered from schizophrenia, but was taking medication that alleviated his symptoms. He testified he was not impaired the morning of the murder. As Stokes sat on a milk crate toward the back of the care home's driveway, he heard the sounds of an argument coming from somewhere across the street. A loud voice said: "You don't want this, [expletive]." Stokes testified the voice was "kind of high-pitched" and sounded like that of a teenager. Stokes then heard several gunshots, a brief pause, and another round of gunfire. He explained the latter round of gunfire sounded "muffled." Due to his position in the back of the driveway, and the presence of a van parked in the front of the driveway, Stokes was unable to see what was happening across the street and did not try to get a better look for fear of being shot. However, according to Stokes, when he first sat down to smoke his cigarette, he noticed two "small cars, dark color," were parked across the street in front of Lara's house. When police questioned Stokes following the murder, he stated he watched these cars park in front of Lara's house shortly before the argument.

Multiple calls were received by 911 dispatchers regarding the shooting. One of these calls came from Lucero. After being dragged to the sidewalk in front of the adult care home next door, Lucero managed to pull out his cell phone, dial 911, and say to the dispatcher, "I've been shot," before the second round of gunfire ended his life. These shots could be heard over the phone. Another call came from a man who lived a few houses to the west of the adult care home where Garcia worked. The man identified himself as Mike and told the dispatcher he heard gunshots, went outside his house and saw a gold Buick LeSabre-type car driving away to the west. The car contained two or three occupants who were either Black or Hispanic. Mike then saw a man lying on the sidewalk down the street to the east. The same car came back down the street in the opposite direction and stopped next to the man on the sidewalk. At this point, the front passenger got out of the car, stood over the man, and fired about five shots at point blank range. Mike did not testify at trial.

### *Police Investigation*

Police and emergency medical personnel arrived within minutes, but Lucero was already dead. He sustained a total of 10 gunshot wounds and multiple blunt force injuries. Six bullets struck him in the head from close range; four bullets struck his extremities, three of which were fired from a distance of greater than two feet. Four of the six head wounds would have been immediately fatal, while the other two also could have killed Lucero. Of the bullets that struck Lucero's extremities, one entered his right calf, causing several bone fractures and severing large blood vessels. This wound also had "a lethal capacity," but only "if left unattended." Based on the medical examiner's testimony, combined with the testimony and statements of witnesses who saw or heard the events described above, it is reasonable to infer Lucero sustained most, if not all, of the gunshot wounds to his extremities and the blunt force injuries while in the carport area, while the immediately fatal head shots were sustained while he lay on the sidewalk in front of the adjacent adult care home. (footnote 8 omitted).

///

5

The physical evidence found at the scene indicates the same gun fired all the shots. Six .40-caliber shell casings and multiple bullet fragments were located around Lucero's body. Three .40-caliber casings were found in the street in front of the carport area. In the carport area, police found additional bullet fragments, a live .40- caliber round, and a .40-caliber magazine containing additional live rounds; no corresponding weapon was found. Six of the casings were compared by a firearms expert, who determined five were definitely fired from the same gun and the sixth was likely fired from the same gun. All of the bullet fragments, including several that were recovered from Lucero's brain during his autopsy, were consistent with having been part of a .40-caliber bullet. Those fragments that were amenable to a rifling analysis were determined to "most likely" have been .40-caliber bullets. (footnote 9 omitted).

Lara remained at his house when police arrived and began their investigation. He was taken into custody and questioned by detectives. Two additional interviews were conducted the following day. We provide a summary of Lara's various statements later in this factual recitation, after setting forth his trial testimony in some detail. When Lara was taken into custody, a white t-shirt he was wearing that had a blood stain on it was collected as evidence. Lara also had small cuts on his hands, including his knuckles, and a small cut on one of his knees.

Lara's house was searched the morning of the murder. In addition to the stolen items taken during the burglary, police found the towel Lara used to wipe his hands while in the kitchen that morning, as well as a white polo shirt and gray sweatpants, all wet, in the bottom of a clothes basket next to the kitchen. Each of these items tested positive for the presence of blood. A DNA analysis indicated Lara's blood was on the towel, while Lucero's blood was on the sweatpants. DNA was not able to be extracted from the blood stain on the polo shirt. However, Lucero's blood was also on the white t-shirt collected from Lara when he was taken into custody.

Flores and Espinoza were arrested two days after the murder. They were also interviewed by detectives. With respect to their statements, it will suffice to note each denied being present at Lara's house during the murder; and, while Espinoza eventually admitted participating in the burglary, Flores also denied involvement in that endeavor. (footnote 10 omitted).  During a search of the apartment where Flores lived with his mother and sisters, police found the non-operational .38-caliber handgun taken during the burglary, which was located inside a pocket of a pair of jeans that was inside a plastic bin. (footnote 11 omitted).  About an hour after Flores was taken into custody, an officer who was watching Flores's apartment noticed a group of people, including Flores's older brother Ray, entering a different apartment in the same complex. When that apartment was later searched, police found three live .40-caliber rounds. (footnote 12 omitted).  At some point, Flores's mother was also questioned by police. She stated Ray owned a small, four-door white car that looked like an older Jeep. At trial, she testified the car belonged to Ray's girlfriend and was sold before the murder occurred.

/ / /

/ / /

6

*Lara's Testimony*

Lara testified in his own defense. Lara testified he and Calvetti were at his house the day of the burglary. That morning, Lara drank some beer and smoked some marijuana. Flores and Espinoza arrived sometime during the day; Lucero showed up in the early evening. The four drank beer together and discussed breaking into a nearby house. With a few minor exceptions, Lara's testimony concerning the subsequent burglary and his argument with Lucero's friend or cousin concerning the latter's desire to take one of the stolen televisions tracked that of Calvetti. Lara also confirmed he and Lucero brought the stolen items into his bedroom later that night, Calvetti was lying down on his bed when they did so, and they then rejoined Flores and Espinoza outside.

Turning to the murder, Lara testified a dark car pulled up and two "older guys" got out. One of the new arrivals was "a big dude" with "long hair," while the other was wearing an Oakland Athletics beanie. The man wearing the beanie was Mexican and taller than Lara, who stood about 5 feet 2 inches in height. Lara thought he heard Lucero call this man, "Demon." According to Lara, he and Lucero showed Demon one of the televisions, which Lara claimed was in the backyard. Apparently uninterested in buying the television, Demon returned to the front of the house with Lucero. Lara joined them. The other new arrival was also there. Lara did not remember where Flores and Espinoza were at this time. Lucero and Demon talked for a while and then began to argue, about what, Lara did not know. Demon then pulled out a handgun. Lara said something like, "Get that shit out of here." When Lucero started to walk away, Demon shot him in the leg. Lara ran into the backyard. He then looked back and saw Demon hitting Lucero, he believed with the gun. The next thing Lara remembered was Demon dragging Lucero toward the street by his legs. Lara did not come to Lucero's aid because Demon "had a gun" and Lara was "drunk, high." Lara then heard a car drive away and went to the front yard to see where Lucero had been dragged. It was at this point, according to Lara, Lucero said: "Bert, call the cops." When Lara went into the house to call the police, he heard the second round of gunfire. Lara denied arguing with Lucero after the burglary, denied shooting him in the leg, denied hitting or kicking him, denied dragging him out of the carport area, denied shooting him in the street, denied seeing Flores or Espinoza do any of these things, and denied telling either of them to do so.

According to Lara, after the second round of gunfire, he used Calvetti's cell phone to call 911, although he did not remember actually talking to anyone. He then noticed he had blood on his sweatpants, took them off, wetted them down to try to get the blood off because he was "sick" and "mad" about the shooting, and threw them in with the dirty laundry. He denied wetting down any shirts and claimed the white polo shirt found in the laundry basket belonged to his cousin. With respect to the towel that was also found in the laundry basket, Lara claimed to have cut his hand while using a window punch tool to break a beer bottle sometime before the burglary, after which he wiped the blood off his hand with a towel and threw it in with the dirty laundry. Lara claimed he got the injury to his leg earlier that night as well, when he tried to kick his dog to prevent him from getting out and instead ended up hitting his leg against a gate. He also might have received one of the injuries to his hands from the incident

with the dog. (footnote 13 omitted).

As previously noted, Lara's testimony that a dark car pulled to the house was corroborated by Stokes's testimony and prior statement to police, although Stokes said there were two dark cars, which matches Lara's statements to detectives (see below). However, as also mentioned, Calvetti testified she did not see any dark cars parked in front of Lara's house the morning Lucero was killed. Nor did Garcia notice any dark cars parked in front of Lara's house that morning.

### *Lara's Statements to Detectives*

Lara's prior statements to detectives were admitted into evidence during the prosecution's case in rebuttal.

With respect to the burglary, early in the first interview, Lara claimed the property taken during the burglary belonged to Lucero, and Lara was just "holding it for him." He claimed Lucero and "a couple other fools" he did not know committed the burglary. A short time later, Lara admitted he was "not being honest" about the burglary and confessed: "I ain't gonna lie, we did break into that piece of shit. Stole it. Stole the stuff, brought it over. Shit." We mention his burglary-related statements no further.

With respect to the murder, Lara denied involvement throughout the three interviews, describing Lucero as "my boy" and "my big homie." He also denied any involvement on the part of Flores and Espinoza, whom he referred to as his "little friends," adding: "Them fools ain't gonna shoot that fool. [They] are only fourteen, fifteen."

Lara's account of who did shoot Lucero was vague and changed as the interviews progressed. In the first interview, he claimed a man in his mid-20s with a fade haircut and wearing an "A's hat or some shit like that" pulled up in a small dark car, got out, and started "talking cool" with Lucero towards the front of the carport area. Lara was sitting down on a chair behind the blue minivan that was in the rear carport while this conversation took place. At some point, the man started "fucking with" Lucero "over some bullshit" and pulled out a gun. When Lucero started to walk away, the man shot him multiple times. According to Lara, Lucero appeared to have been shot in the face, back, and legs. Lara "cutted" to his backyard. He believed the man then dragged Lucero into the street, but stated he did not actually see the dragging. When the shooter left, apparently in the dark car, Lara went out front to check on Lucero and heard him calling out: "Bert, call the cops." Lara went back to the house to do so, at which point, "the car came back and finished him off." Lara did not say what Espinoza was doing during the argument and shooting, but claimed he "cutted after all that happened." He initially claimed Flores left before the incident, but then admitted he was there as well.

When the detectives told Lara other people had implicated him as being involved in the murder, Lara added to his account that "some other fools" pulled up in a second dark car, but this other car "took off" before the shooting started. Lara also added details to the argument that transpired before the shooting. Specifically, Lara claimed the shooter said to Lucero, "you fucked up" and "get out of here," and then Lara told the shooter to "get that shit up out of here," apparently referring to the gun. Later in the

interview, he stated Flores and Espinoza "probably hopped the other car and took off." When the detectives accused Lara of being the shooter, he denied it and asked that his hands be tested for gunpowder residue. Lara denied getting into an argument with Lucero that morning, denied either Flores or Espinoza got into an argument with Lucero, and when one of the detectives asked who "had the argument over the gun" and who "was yelling to give him back the gun," Lara denied any such argument occurred. When the detectives indicated they did not believe him, Lara said: "Well, what am, what am I supposed to do, man? I'm supposed to snitch? [¶] . . . [¶] And just tell it? And then I end up dead?" Towards the end of the first interview, Lara added the shooter had "one boy with him," but provided no description of this other person.

With respect to some of the physical evidence, Lara admitted he was wearing gray sweatpants when Lucero was murdered. He said he took them off afterward because he got blood on them when Lucero was shot in the carport area and fell to the ground. His statement is not very clear with respect to how he got the blood on his sweatpants. He appears to have claimed that when Lucero was shot, he immediately went to where Lucero fell to the ground and picked up some "broken glass[]," apparently from some bottles that also fell to the ground at the same time, and while he was "[p]icking up all that bullshit," the man who shot Lucero "started coming" toward them, and it was at that point Lara ran to the backyard. With respect to the .40-caliber magazine that was found in the carport area, Lara denied knowing where it came from. Lara denied ever possessing a .40- or .45-caliber handgun. Lara also claimed the injury to his knee happened when he tried to kick his dog at some point before the murder and he injured his knuckles playing with the window punch tool.

At the start of the second interview, Lara stated the man who shot Lucero pulled up in a car, got out and started talking to Lucero, "everything was cool." Then, another car pulled up, another man got out, and everything was still "cool," until the first man "started shooting, that's when everybody started taking off." Lara added that Lucero was walking from the street in front of the carport area back to the minivan in the rear carport when the shooter, who was still in the street, pulled out a gun and started shooting, hitting Lucero in the leg. According to Lara, the shooter then walked up to Lucero, "they were wrestling" and "fighting," and then the shooter dragged Lucero out of the carport area and left him in front of the adjacent house. Unlike the first interview, Lara claimed to have seen the dragging in this interview. He also claimed he did not go to Lucero's aid because he was afraid of getting shot and "didn't know what to do." Lara then stated the man who was with the shooter was dressed "all in black" and "was standing right there like he had his back in case anything happens." At some point during these events, or as Lara put it, "when that bullshit was going on," some of his friends pulled up in another car, but they "just pulled up at the wrong time" and drove off when "they seen what was going on." When one of the detectives asked what Flores and Espinoza were doing, Lara answered: "I don't know, I don't even fuckin' remember if they were there." Lara again denied he nor Flores or Espinoza was involved in the murder and told the detectives to "ask witnesses, they seen the cars pull up." He then stated he believed Flores and Espinoza got into the "other car that pulled up" that he claimed was "a white Jeep, like, some shit like that."

1  During the third interview, one of the detectives asked Lara whether he
2  helped the shooter drag Lucero in order to get him off of Lara's property,
   which Lara denied. Lara then asked to "start from the beginning." In
3  another iteration of the events leading to Lucero's murder, Lara claimed
   the shooter pulled up, got out of the car, and started talking to Lucero in
4  the front yard, "it was all good." Then, Lucero asked Lara to show the new
   arrival the televisions taken during the burglary. Lara went into his
5  bedroom to do so. The man was supposed to come to his bedroom window
   to look at the televisions. When Lara opened the window, Flores and
6  Espinoza told him Lucero and the man were arguing. Lara then "hopped
   out the window" and returned to the front, where the argument was
7  happening. At this point, according to Lara, the shooting and other events
   he previously described occurred. Lara again denied being involved. Later
8  in the interview, Lara added that Flores's brother Ray was in the car Flores
   and Espinoza got into when they left as the shooting was happening in the
9  carport area. He also told detectives he believed the shooter went by the
   nickname, "Demon."

10 People v. Lara, 9 Cal. App. 5th 296, 303-313 (2017); see also ECF No. 9,
   Lod. Doc. 7, pgs. 5-20.

11

12 **B.    Procedural History**

13      On October 15, 2012, Petitioner was sentenced to 25 years to life for first-degree

14 murder, a consecutive term of one year for being a principal armed with a firearm, a consecutive

15 term of six years for first-degree burglary, a consecutive term of five years for a corresponding

16 gang enhancement, and a concurrent term of two years for active participation in a criminal street

17 gang. See ECF No. 9, Lod. Doc. 7, pgs. 2-3.  Petitioner appealed his sentence to the California

18 Court of Appeal. On March 6, 2017, the state appellate court reduced Petitioner's conviction from

19 first-degree murder to second-degree murder and reversed Petitioner's conviction for active

20 participation in a criminal street gang. See Lod. Doc. 7, pgs. 72-73. Petitioner's sentence thus

21 became fifteen years to life for second degree murder, a consecutive term of one year for the

22 corresponding firearm allegation, and a consecutive determinate term of six years for first-degree

23 burglary. See Lod. Doc. 8. The California Supreme Court denied direct review on May 24, 2017,

24 without comment or citation. See ECF No. 1, pg. 2. Petitioner did not seek post-conviction relief

25 by way of state court habeas petitions. Id.

26      Petitioner filed his federal petition on September 26, 2018. See ECF No. 1. The

27 petition is timely filed. See 28 U.S.C. § 2244(d)(1)(A). Respondent filed his answer on December

28 17, 2018. See ECF No. 8. Petitioner has not filed a traverse.

10

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

1   (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the

2   holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc).

3   Supreme Court precedent is not clearly established law, and therefore federal habeas relief is

4   unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54

5   (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal

6   law to be clearly established, the Supreme Court must provide a "categorical answer" to the

7   question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state

8   court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

9   contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

10  created by state conduct at trial because the Court had never applied the test to spectators'

11  conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's

12  holdings. See Carey, 549 U.S. at 74.

13          In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

14  majority of the Court), the United States Supreme Court explained these different standards. A

15  state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

16  the Supreme Court on the same question of law, or if the state court decides the case differently

17  than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state

18  court decision is also "contrary to" established law if it applies a rule which contradicts the

19  governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate

20  that Supreme Court precedent requires a contrary outcome because the state court applied the

21  wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court

22  cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

23  406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine

24  first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6

25  (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal

26  habeas relief is warranted. See id. If the error was not structural, the final question is whether the

27  error had a substantial and injurious effect on the verdict, or was harmless. See id.

28  / / /

12

1        State court decisions are reviewed under the far more deferential "unreasonable

2   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

3   unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

4   510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

5   that federal habeas relief may be available under this standard where the state court either

6   unreasonably extends a legal principle to a new context where it should not apply, or

7   unreasonably refuses to extend that principle to a new context where it should apply.  See

8   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

9   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

10  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

11  75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even

12  where the federal habeas court concludes that the state court decision is clearly erroneous.  See

13  Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

14  deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

15  As with state court decisions which are "contrary to" established federal law, where a state court

16  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

17  unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

18        The "unreasonable application of" standard also applies where the state court

19  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

20  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

21  are considered adjudications on the merits and are, therefore, entitled to deference under the

22  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

23  The federal habeas court assumes that state court applied the correct law and analyzes whether the

24  state court's summary denial was based on an objectively unreasonable application of that law.

25  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

26  / / /

27  / / /

28  / / /

1

### III.  DISCUSSION

2        Petitioner raises three grounds for relief.  According to Petitioner: (1) the trial

3   court erred by failing to instruct the jury that it must unanimously agree on the underlying act that

4   caused the victim's murder; (2) the trial court erred by failing to instruct the jury on the lesser

5   charge of attempted murder; and (3) trial counsel was ineffective due to counsel's failure to

6   request a voluntary intoxication instruction.  For the reasons discussed below, the Court finds

7   Petitioner's arguments unconvincing and recommends that his petition be denied on the merits.

8        **A.**     **Jury Instructions Claims**

9        Petitioner argues federal habeas relief is warranted because the trial court erred in

10  instructing the jury.  Specifically, Petitioner contends the trial court: (1) failed to instruct the jury

11  on the unanimity requirement pursuant to CALCRIM No. 3500; and (2) failed to instruct the jury

12  on the lesser charge of attempted murder.

13       A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

14  transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

15  1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available

16  for alleged error in the interpretation or application of state law.  See Middleton, 768 F.2d at

17  1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

18  F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

19  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury instructions does

20  not generally give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing

21  Engle v. Isaac, 456 U.S. 107, 119 (1982)).

22       However, a "claim of error based upon a right not specifically guaranteed by the

23  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

24  infects the entire trial that the resulting conviction violates the defendant's right to due process."

25  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

26  Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

27  claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

28  miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

1    F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

2           In general, to warrant federal habeas relief, a challenged jury instruction "cannot

3    be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

4    process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317

5    (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

6    must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

7    conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

8    414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

9    jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

10   process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

11   1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

12   'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

13   way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

14   U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

15   instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

16   necessary element completely, the "reasonable likelihood" standard does not apply and the court

17   may not ". . . assume that the jurors inferred the missing element from their general experience or

18   from other instructions. . . ." See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the

19   case of an instruction which omits a necessary element, constitutional error has occurred. See id.

20          Even if there is constitutional error, non-structural errors may be harmless. See

21   Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386

22   U.S. 18 (1967)).  In the context of jury instructions, an error is not structural so long as the error

23   does not "vitiat[e] all the jury's findings." Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993)

24   (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to

25   harmless error analysis).  An instructional error which resulted in omission of an element of the

26   offense was a trial error subject to harmless error review. See Hedgpeth, 129 S.Ct. at 532 (citing

27   Neder v. United States, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also not

28   structural. See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)).  A jury instruction

1   which misstates an element of an offense is also not structural.  See id. (citing Pope v. Illinois,

2   481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.  See id.

3   (citing Rose v. Clark, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of guilt

4   where one of the theories is improper does not result in a structural error requiring automatic

5   reversal but is error subject to harmless error analysis.  See id.

6          In Chapman, a case before the Supreme Court on direct review, the Court held that

7   "before a [non-structural] constitutional error can be held harmless, the court must be able to

8   declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

9   harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the Court

10  stated that applying the Chapman standard on collateral review "undermines the States' interest in

11  finality and infringes upon their sovereignty over criminal matters."  507 U.S. 619, 637.  The

12  Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus

13  – which is meant to afford relief only to those who have been grievously wronged – because it

14  would require relief where there is only a reasonable possibility that a constitutional error

15  contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos

16  v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural

17  constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where

18  non-structural error occurs only where such error "had a substantial and injurious effect or

19  influence in determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

20                1.    Unanimity Instruction under CALCRIM No. 2500

21         According to Petitioner, the trial court erroneously failed to instruct the jury under

22  CALCRIM No. 3500 that they must unanimously agree on the underlying act that caused the

23  victim's murder. See ECF No. 1, pg. 4. Petitioner argues that the carport altercation and the

24  sidewalk altercation were two different crime scenes and thus established the need for a

25  unanimity requirement. Id.  Petitioner also contends that the prosecution's theories of Petitioner's

26  role in the murder could have led to Petitioner being convicted as the principal in first-degree

27  murderer, an aider and abettor to the first-degree murder, second-degree murder, and voluntary

28  manslaughter. Id.

1    Regarding the failure to instruct the jury on the unanimity requirement, the

2    California Court of Appeal stated:

3          Lara also claims the trial court prejudicially erred by failing to provide the
           jury with a unanimity instruction because the prosecution relied on
4          multiple factual scenarios to support the murder charge. He is mistaken.

5          A criminal defendant has a constitutional right to a unanimous jury
           verdict, meaning "the jury must agree unanimously the defendant is guilty
6          of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.)
           Thus, "if one criminal act is charged, but the evidence tends to show the
7          commission of more than one such act, '*either* the prosecution must elect
           the specific act relied upon to prove the charge to the jury, *or* the court
8          must instruct the jury that it must unanimously agree that the defendant
           committed the same specific criminal act.' [Citation.]" (*People v. Napoles*
9          (2002) 104 Cal.App.4th 108, 114.) In such a case, where no election has
           been made by the prosecution, the trial court possesses a sua sponte duty
10         to provide a unanimity instruction. (*People v. Dieguez* (2001) 89
           Cal.App.4th 266, 274-275.)
11
           "On the other hand, where the evidence shows only a single discrete crime
12         but leaves room for disagreement as to exactly how that crime was
           committed or what the defendant's precise role was, the jury need not
13         unanimously agree on the basis or, as the cases often put it, the 'theory'
           whereby the defendant is guilty. [Citation.] The crime of burglary provides
14         a good illustration of the difference between discrete crimes, which
           require a unanimity instruction, and theories of the case, which do not.
15         Burglary requires an entry with a specified intent. [Citation.] If the
           evidence showed two different entries with burglarious intent, for
16         example, one of a house on Elm Street on Tuesday and another of a house
           on Maple Street on Wednesday, the jury would have to unanimously find
17         the defendant guilty of at least one of those acts. If, however, the evidence
           showed a single entry, but possible uncertainty as to the exact burglarious
18         intent, that uncertainty would involve only the theory of the case and not
           require the unanimity instruction. [Citation.] Other typical examples
19         include the rule that, to convict a defendant of first degree murder, the jury
           must unanimously agree on guilt of a specific murder but need not agree
20         on a theory of premeditation or felony murder [citation], and the rule that
           the jury need not agree on whether the defendant was guilty as the direct
21         perpetrator or as an aider and abettor as long as it agreed on a specific
           crime [citation]." (*People v. Russo, supra*, 25 Cal.4th at pp. 1132-1133.)
22
           Here, even accepting Lara's premise there were two separate crime scenes,
23         i.e., the carport area where the initial assault with a firearm occurred and
           the sidewalk next door where the fatal shots were fired, this does not mean
24         there were two murders. There was one murder. Under the prosecution's
           various theories of this single crime, Lara was either the direct perpetrator
25         of the murder or an aider and abettor in the crime that began in the carport
           area with an assault with a firearm and was completed on the sidewalk
26         next door, or he was the direct perpetrator of the assault with a firearm in
           the carport area or an aider and abettor in that crime, the natural and
27         probable consequence of which was the murder that happened on the
           sidewalk next door. These are separate theories of liability for a single
28         crime, Lucero's murder. The jury "need not have unanimously agreed on

                                          17

1

2

3

4

    the precise factual details of how [the] killing under one or the other theor[ies] occurred in order to convict defendant of [this] murder." (*People v. Pride* (1992) 3 Cal.4th 195, 250.) We therefore reject Lara's assertion that an unanimity instruction was required.

    ECF No. 9, Lod. Doc. 7, pgs. 61-63.

5

6

7

8

9

10

11

12

13

14

15

16

    The Court finds that the state court's denial of Petitioner's CALCRIM No. 3500 claim was neither contrary to nor based on an unreasonable application of law.  Petitioner contends that the California Court of Appeal incorrectly applied established law by concluding that the altercation at the carport and the altercation on the sidewalk were part of one occurrence. See ECF No. 1, pg. 5. However, there were mere minutes between the two occurrences and Lucero received multiple severe gunshot wounds during each encounter. See ECF No. 9, Lod. Doc. 7, pgs. 7-14. It is not the role of the federal court to retry state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972). Therefore, this Court need not come to a novel conclusion as to whether the incidents constituted one or two occurrences as the California Court of Appeal's conclusion was reasonable.  This is especially true where, as here, the state court's determination as to whether the two altercations were part of the same criminal occurrence was based on application of state law.

17

18

19

20

21

22

23

24

25

26

27

    Further, as the California Court of Appeal observed, the carport altercation and the sidewalk altercation did not compromise two different crimes.  Even if the prosecution advanced multiple theories regarding Petitioner's role in the murder, these theories of liability still centered around the same crime which was Lucero's murder. As the Court of Appeal observed, "the jury 'need not have unanimously agreed on the precise factual details of how [the] killing under one or the other theories in order to convict this defendant of murder.'" See ECF No. 9, Lod. Doc. 7, pgs. 61-63 (quoting People v. Pride, 3 Cal. 4th 195, 250 (1992)). The differences Petitioner points out in potential crimes would have represented different theories of how the same underlying crime occurred. Thus, the trial court could not have erred by failing to instruct the jury pursuant to CALCRIM No. 3500 and, even if it had erred, any error was harmless under the Chapman standard.

28

    / / /

1          2.      Lesser Charge Instruction

2          Under Beck v. Alabama, 447 U.S. 625, 638 (1980), it is well-settled that, in capital

3   cases, failure to give a lesser included offense instruction where the evidence supports the

4   instruction results in constitutional error.  However, there is no such settled rule for non-capital

5   cases.  See Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995), overruled on other ground by

6   Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  As the court in Turner observed, there is a circuit

7   split on the question.  See id.  In the Ninth Circuit, the Beck rule does not apply in non-capital

8   cases.  See Bashor v. Risley, 730 F.2d 1288, 1240 (9th Cir. 1984).  The Eleventh and Tenth

9   Circuits agree.  See Perry v. Smith, 810 F.2d 1078, 1080 (11th Cir. 1987); Trujillo v. Sullivan,

10  815 F.2d 597, 602 (10th Cir. 1987).  The Seventh and First Circuits only apply Beck in non-

11  capital cases to prevent a fundamental miscarriage of justice.  See Tata v. Carver, 917 F.2d 670,

12  672 (1st Cir. 1990); Nichols v. Gagnon, 710 F.2d 1267, 1272 (7th Cir. 1983).  The Third and

13  Sixth Circuits, however, generally apply Beck in all non-capital cases.  See Vujosevic v. Rafferty,

14  844 F.2d 1023, 1027 (3rd Cir. 1988); Ferrazza v. Mintzes, 753 F.2d 967, 968 (6th Cir. 1984).

15  The Supreme Court has not addressed the applicability of Beck in non-capital cases.

16         Because there is no clearly established Supreme Court precedent applying the

17  Beck lesser included offense rule in non-capital cases, and because creating such a rule in this

18  case would violate the non-retroactivity principles of Teague v. Lane, 489 U.S. 288 (1989), this

19  court is bound to follow Ninth Circuit precedent.  Therefore, federal habeas relief is not available

20  on this claim in non-capital cases.  See Turner, 182 F.3d at 819.  The Court will nonetheless

21  evaluate Petitioner's argument that, the Beck rule should apply in this non-capital case.

22         According to Petitioner, the trial court erroneously failed to instruct the jury on the

23  lesser charge of attempted murder. See ECF No. 1, pg. 4. As with unanimity, Petitioner argues

24  that the altercation in the carport and the altercation on the sidewalk were two separate

25  occurrences rather than an extension of the same murder. Id. Petitioner also contends that Lucero

26  survived the original carport shooting because he called 911 on his own. Id. Petitioner therefore

27  argues that had the jury concluded that Lara participated in the carport shooting and not the

28  sidewalk shooting, the jury would have concluded that Lara was only guilty of attempted murder.

Id.

Regarding the attempted murder instruction, the California Court of Appeal held:

Lara further asserts the trial court prejudicially erred by failing to instruct the jury on attempted murder as a lesser included offense to murder. This argument is based on the notion that because the shooting in the carport area was not immediately fatal, that shooting "was really only an attempted murder" regardless of the fact additional shots, likely from the same gun, completed the job next door. We disagree.

In a criminal case, the trial court "must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present. [Citations.] 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Souza* (2012) 54 Cal.4th 90, 114.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"An offense is a lesser included offense to a charged offense if the former is necessarily included in the latter. There are two tests to determine whether this is so: (1) if all of the elements of the lesser offense are included in the elements of the greater offense, or (2) if the allegations of the pleading describe the charged offense so that it necessarily includes all the elements of the lesser offense." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642, citing *People v. Lopez* (1998) 19 Cal.4th 282, 288-289.)

Beginning with the elements test, murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger. [Citations.]" (*People v. Elmore, supra,* 59 Cal.4th at p. 133.) Attempted murder, on the other hand, "requires the specific intent to kill," i.e., express malice, and "the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Because attempted murder requires a greater mens rea, express malice, than does murder, which may be committed with either express or implied malice, the latter crime can "be committed without also necessarily committing [the former]" (*People v. Lopez, supra,* 19 Cal.4th at p. 288), and is not a lesser included offense under the elements test. (See also *People v. Bailey* (2012) 54 Cal.4th 740, 753 [no duty to instruct on attempted escape because it had a more specific intent requirement than the crime of escape].)

/ / /

/ / /

1

2

3

4

5

The pleading, however, charged Lara not simply with murder, but with first degree premeditated murder that required the jury to "find a 'killing . . . preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill,'" i.e., express malice. (*People v. Catlin* (2001) 26 Cal.4th 81, 151.) Attempted murder is a lesser included offense to first degree premeditated murder because "the sole distinction between [an attempted murder] and [a completed premeditated murder] is completion of the act constituting the crime." (*People v. Braslaw* (2015) 233 Cal. App.4th 1239, 1248.)

6

7

8

9

10

We must therefore determine whether "there is substantial evidence that only the lesser crime was committed." (*People v. Birks* (1998) 19 Cal.4th 108, 112.) As we have already explained, there was insufficient substantial evidence Lara intended to kill Lucero at all. Thus, just as his conviction for first degree premeditated murder was not supported by substantial evidence, neither was instruction on attempted murder as a lesser included offense to that crime. Conviction of the lesser included offense of second-degree murder was, however, sufficiently supported by the evidence, as we have fully explained.

11

ECF No. 9, Lod. Doc. 7, pgs. 63-65.

12

13

14

15

16

17

18

19

20

21

The Court finds that the state court's denial of Petitioner's lesser charge jury instruction claim was neither contrary to nor based on an unreasonable application of law. The state court's determination that the transactions in the carport and the sidewalk were part of a larger singular murder was far from unreasonable. Petitioner himself admits there were mere minutes between the altercation in the carport and the altercation on the sidewalk. See ECF No. 1, pg. 4. Petitioner's speculations on how the jury could have viewed the events had they received a lesser charge instruction cannot on its own establish that the trial court erred so much as to result in a fundamental miscarriage of justice. Further, even if Lara was correct in asserting that that the trial court erred, failure to give a lesser offense instruction is not a constitutional error in non-capital cases in the Ninth Circuit. See Bashor, 730 F.2d at 1240.

22

**B.       Ineffective Assistance of Counsel Claim**

23

24

25

26

Petitioner argues that his trial counsel failed to provide adequate representation such that his petition for writ should be granted for violation of his rights under the Sixth Amendment. Respondent disagrees and argues that Petitioner cannot demonstrate sufficient error on the part of defense counsel to justify granting the writ. The Court agrees with Respondent.

27

///

28

///

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  See id.   In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Petitioner argues that his trial counsel erred in failing to request a voluntary intoxication jury instruction. See ECF No. 1, pg. 5. Petitioner contends that a voluntary intoxication instruction would have complimented Petitioner's defense theories rather than contradicting Petitioner's primary defense that he was only an innocent bystander. Id. Petitioner further argues that the voluntary intoxication instruction could have rebutted the idea that Petitioner was capable of forming the express intent to kill or aid and abet. Id.

Regarding Petitioner claim, the California Court of Appeal held:

We also reject Lara's contention his trial counsel provided constitutionally deficient assistance by failing to request the jury be instructed with CALCRIM No. 625 on the effect of voluntary intoxication on his ability to formulate the intent to kill or to aid and abet either the murder or the assault with a firearm.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

Here, as the Attorney General correctly observes, Lara's defense was that "he was an unsuspecting bystander who witnessed the murder of his friend." There was evidence to support this theory, in addition to Lara's own statements and testimony. There was also substantial evidence supporting the prosecution's contrary theory, at least with respect to second degree murder under the natural and probable consequences doctrine. The jury obviously did not believe Lara's version of events. In hindsight, it might have been advantageous to have requested an instruction on voluntary intoxication. But doing so would have placed an inconsistent defense before the jury. Thus, defense counsel might well have made a tactical decision to rely solely on the bystander defense rather than risk the jury viewing use of an intoxication defense as a tacit concession Lara played a larger role in the murder than his testimony let on. (See *People v. Jones* (1991) 53 Cal.3d 1115, 1138 ["presentation of conflicting defenses is often tactically unwise"].) It is not for this court to "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Having concluded there may be a satisfactory explanation for defense counsel's failure to request instruction on voluntary intoxication, we must reject Lara's assertion that counsel's performance fell below an objective standard of reasonableness.

ECF No. 9, Lod. Doc 7, pgs. 65-66.

///

1        The Court finds that the state court's denial of Petitioner's claim of ineffective

2    assistance of trial counsel was neither contrary to nor based on an unreasonable application of

3    clearly established law. Here, Petitioner's primary argument is that had counsel made the tactical

4    decision to provide the voluntary intoxication instruction, then counsel could have rebutted more

5    of the People's theories regarding Petitioner's involvement in the murder. Id. However, Petitioner

6    himself concedes that "it appears petitioner's counsel may have had a tactical reason not to stress

7    evidence of petitioner's intoxication." Id. As the Court of Appeal observed, Petitioner had the

8    burden of proving that his counsel's performance fell below "an objective standard of

9    reasonableness. . .under prevailing professional norms." See ECF No. 9, Lod. Doc. 7, pg. 65

10   (quoting In re Harris, 5 Cal. 4th 813, 832-833 (1993)).

11       Petitioner's argument that counsel could have made better tactical decisions does

12   not establish that counsel's performance fell below a standard of reasonableness. As the

13   California Court of Appeal noted, Petitioner's counsel likely made a tactical decision to avoid the

14   voluntary intoxication defense rather than risking the jury seeing the defense as a concession of

15   Lara's greater role. Further, even if Petitioner was correct that the Court of Appeal erred in its

16   judgment, the Supreme Court has clearly established that a state court decision is not an

17   unreasonable application simply due to an erroneous or incorrect application. See Williams, 529

18   U.S. at 410. The state court's determination that Petitioner's counsel made a tactical decision in

19   not instructing the jury on CALCRIM No. 625 was objectively reasonable as discussed above.

20   Thus, Petitioner has not stated a claim upon which federal relief could be granted.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

# IV. CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 11, 2021

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

25